97 N.Y.2d 256 (2002)
766 N.E.2d 934
740 N.Y.S.2d 272
In the Matter of RLI INSURANCE COMPANY, SURETY DIVISION, Appellant,
v.
NEW YORK STATE DEPARTMENT OF LABOR et al., Respondents.
Court of Appeals of the State of New York.
Argued January 9, 2002.
Decided February 7, 2002.
*258 Ernstrom & Dreste LLP, Rochester (Theodore M. Baum, Michael F. Dehmler and John W. Dreste of counsel), for appellant.
Eliot Spitzer, Attorney General, New York City (M. Patricia Smith, Caitlin J. Halligan, Michael S. Belohlavek and Daniel J. Chepaitis of counsel), for New York State Department of Labor and another, respondents.
*259 Wolff & Samson, P.A., New York City (Armen Shahinian and Scott D. Baron of counsel), for Surety Association of America, amicus curiae.
Chief Judge KAYE and Judges SMITH, CIPARICK, WESLEY, ROSENBLATT and GRAFFEO concur.

*260 OPINION OF THE COURT
LEVINE, J.
Petitioner RLI Insurance Company, as surety, posted performance and payment bonds on a public improvement project. RLI now claims subrogation rights after fully completing the construction on behalf of the defaulting contractor and paying all subcontractors, laborers and suppliers. At issue is whether RLI's right to funds still in the possession of the project owner is superior to a claim filed by respondent Department of Labor (DOL) for underpaid wages rendered on an unrelated project. We conclude that it is. We therefore reverse the contrary ruling by the courts below.
On May 5, 1998, D.C. White Company Inc. entered into an agreement with the Queensbury Union Free School District to be the general contractor on a public improvement project involving renovations to the School District's buildings (the Queensbury Project). Shortly thereafter, White procured payment and performance bonds from RLI. White commenced work and submitted an application to the School District for payment in June 1998. The project's construction manager and architect certified in July 1998 that $53,424 was due.
Subsequently, the School District's construction manager notified White that it was in default and the District terminated the contract effective August 21, 1998. RLI, as surety, thereafter undertook performance of the contract and expended in excess of $176,000 to complete the Queensbury Project and pay all claims of Lien Law article 3-A trust beneficiaries. Concededly, the remaining liability of the School District for the completion of the project after White's default was $135,250.
On July 9, 1999, respondent DOL served the School District with a Notice of Withholding of payment from White in the amount of $19,150.15, pursuant to Labor Law § 220-b (2) (a) (1). The Notice alleged that a subcontractor to White failed to pay prevailing wages on the Queensbury Project. That same day, DOL served a Notice of Cross-Withholding in the amount of $27,000.23 based on a prior underpayment of wages on an unrelated public improvement projectthe "Albany Project." Thereafter, the School District released $89,099.62 to RLI but continues to withhold the balance pursuant to DOL's directives.
RLI commenced this CPLR article 78 proceeding seeking to compel DOL to withdraw its Notice of Cross-Withholding and to enjoin the School District from releasing any funds to DOL pursuant to the notice. Supreme Court denied the petition, holding that DOL's claim to the cross-withheld funds is consistent *261 with the provisions of Lien Law article 3-A and superior to any claim of RLI, as surety. The court relied upon RLI's concession that the Notice of Withholding on the Queensbury Project has priority and concluded that because Labor Law § 220-b (2) (a) (1) does not distinguish between withholdings and cross-withholdings, DOL should also prevail on the latter claim in this case.
The Appellate Division affirmed, reasoning that the clear intent of Labor Law § 220-b (2) (a) (1) is to vest in DOL the ability to seize funds for prevailing wage violations from any public entity retaining funds due the offending contractor, whether or not earned on that public improvement project. This Court granted leave to appeal and we now reverse.
The statutory framework for the resolution of this appeal consists of Labor Law article 8 and Lien Law article 3-A. Labor Law § 220-b (2) (a) (1) authorizes DOL to collect unpaid statutory wages by directing a contracting public agency to withhold funds "from any payment due or earned" (emphasis supplied) by a contractor pending a determination of the contractor's statutory liability on that or an unrelated project. Article 3-A of the Lien Law provides that "funds * * * received by a contractor under or in connection with a contract for * * * a public improvement * * * and any right of action for any such funds due or earned or to become due or earned, shall constitute assets of a trust" (Lien Law § 70 [1]). The assets of an article 3-A trust "shall be held and applied" to payment of article 3-A trust beneficiaries and costs of the improvement to real property (Lien Law § 71).
RLI contends that the funds still held by the School District pursuant to the Notices of Withholding and Cross-Withholding are article 3-A trust assets. It further argues that the School District, as owner, has the contractual right to withhold the funds to pay article 3-A trust beneficiaries, such as suppliers, subcontractors and laborers on the Queensbury Project; that those beneficiaries are entitled to be paid from the trust funds; and that in making full payment and completing performance, RLI is subrogated to the rights of both the owner and the statutory trust beneficiaries.
DOL asserts that funds withheld pursuant to the Labor Law do not constitute assets of a Lien Law article 3-A trust since the assets of such a trust are derivative of the contractor's right to payment. Therefore, DOL maintains, if it is established that the contractor failed to pay prevailing wages, its right to *262 payment supersedes to that extent any amount due the contractor and, hence, neither the contractor nor the article 3-A beneficiaries have any right to the withheld funds. Alternatively, DOL argues that even if the funds at issue were the assets of an article 3-A trust, the general contractor here has no beneficial interest in the funds and RLI's subrogation rights are limited to those of the contractor.
We disagree with both of DOL's contentions. As a matter of statutory construction and under our precedents, even before funds are "due or earned," they become assets of an article 3-A trust. In addition, RLI may rely upon its equitable subrogation rights to recover the funds withheld by the School District.
An article 3-A trust commences "when any asset thereof comes into existence" and continues until all trust claims have been paid or discharged, or all assets have been applied for trust purposes (see, Lien Law § 70 [3]; see also, Postner and Rubin, New York Construction Law Manual § 9.69, at 352-353). The trust is "broadly inclusive" and consists of assets of every conceivable type arising from the work, including rights of action, as well as realized assets (see, City of New York v Cross Bay Contr. Corp., 93 NY2d 14, 19 [1999]; Onondaga Commercial Dry Wall Corp. v 150 Clinton St., 25 NY2d 106, 111 [1969]). Trust claims are "deemed to be in existence from the time of the making of the contract or the occurrence of the transaction out of which the claim arises" (Lien Law § 71 [5]; see also, Bowmar, Lien Priorities in New York § 3.8, at 183). Indeed, Lien Law § 70 (1) (a) provides that a "right of action" includes "any right to receive payment at a future time" even where such right "is contingent upon performance or upon some other event."
Section 70 (1) (a) thus "extend[s] the right of action as a trust asset to contingent, not fully matured rights to receive payment for work in progress" (Canron Corp. v City of New York, 89 NY2d 147, 157 [1996]; see also, 1959 Report of NY Law Rev Commn, at 218, reprinted in 1959 NY Legis Doc No. 65 [F], at 34). Accordingly, trust assets may come into existence before funds are actually due and earned by a contractor. While section 70 (1) (a) further provides that "the fact that the right is a trust asset does not enlarge the right or excuse any performance or condition upon which it depends," this proviso subjects trust beneficiaries' enforcement rights only to an "owner's defenses to payment, if any, under the contract" (Canron, *263 supra, at 157 [emphasis in original]).
Lien Law article 3-A mandates that once a trust comes into existence, its funds may not be diverted for non-trust purposes. Use of trust assets for any purpose other than the expenditures authorized in Lien Law § 71 before all trust claims have been paid or discharged constitutes an improper diversion of trust assets, regardless of the propriety of the trustee's intentions (see, Lien Law § 72 [1]; Canron, supra, at 154; Aquilino v United States, 10 NY2d 271, 279-280 [1961]). Only after all trust claims have been paid or discharged does a beneficial interest in the remaining balance vest in the trustee owner or contractor (see, Lien Law § 70 [3]). These provisions further the statute's remedial purpose of "`insur[ing] that funds obtained for financing of an improvement of real property and moneys earned in the performance of a contract for * * * [an] improvement will in fact be used to pay the costs of that improvement'" (Canron, supra, at 153-154 [quoting 1959 Report of NY Law Rev Commn, at 209, reprinted in 1959 NY Legis Doc No. 65 (F), at 25]; see also, Caristo Constr. Corp. v Diners Fin. Corp., 21 NY2d 507, 512 [1968]).
Given the comprehensive language of Lien Law article 3-A and the inclusion of even unmatured rights to future payment as trust assets, DOL's position that its cross-withholding attached before any article 3-A trust asset came into existence is untenable. A comparison of the literal language of Labor Law § 220-b (2) (a) (1) with that of Lien Law § 70 (1) reveals that the article 3-A trust is broader and may arise prior to the existence of any funds to which DOL's notice of cross-withholding could attach. By its terms, Labor Law § 220-b (2) (a) (1) permits DOL to direct a cross-withholding only on "payment[s] due or earned the contractor." In contrast, an article 3-A trust covers not only "any right of action for any * * * funds due or earned," but also a right of action for funds "to become due or earned" (Lien Law § 70 [1] [emphasis supplied]). Contrariwise, as DOL concedes, Labor Law § 220-b (2) (a) (1) "presumes" that the contractor has rendered performance under the contract sufficient to create an entitlement to payment; thus, cross-withholding would not extend to unmatured rights of the contractor to payment. It necessarily follows that for purposes of cross-withholding to pay laborers' wages on an unrelated public improvement project, DOL is in a secondary position with respect to the article 3-A trust beneficiaries, *264 whose rights arose at the time of contract execution and prior to the existence of the contractor's right to payment.[*]
This conclusion is supported by the primary purpose of article 3-A and its predecessors"to ensure that `those who have directly expended labor and materials to improve real property [or a public improvement] at the direction of the owner or a general contractor' receive payment for the work actually performed" (Canron, supra, at 155 [quoting West-Fair Elec. Contrs. v Aetna Cas. & Sur. Co., 87 NY2d 148, 157 (1995)]). Indeed, the statute's prohibition against diversion of funds to purposes unrelated to a particular improvement was intended to eradicate the practice of "pyramiding," in which contractors use loans or payments advanced in the course of one project to complete another (Aquilino, 10 NY2d, at 275, supra [citing 1942 Report of NY Law Rev Commn, at 298-306, reprinted in 1942 NY Legis Doc No. 65 (H), at 28-36]). Indisputably, if White had used the trust funds here to reimburse unpaid laborers on the Albany Project prior to satisfying all trust obligations on the Queensbury Project, its diversion of trust fund assets would have constituted a class E felony (see, Lien Law § 79-a [1]).
Therefore, the reliance by the courts below on the absence of any distinction in Labor Law § 220-b between withholdings and cross-withholdings misses the mark. While the statute authorizes the filing of both kinds of notices, it neither expressly nor impliedly directs that claims of laborers on an unrelated project should be afforded a preference in an action to enforce an article 3-A trust (see, Lien Law § 77 [8]; see also, Bowmar § 3.20, at 244-246, supra [recognizing that while certain tax claims are afforded preference under section 77 (8), a lien asserted by a tax entity with a claim unrelated to the trust may be set aside as a diversion]).
We similarly reject DOL's alternative argument that RLI's rights, as subrogated surety, are limited to those available to White, as contractor. RLI has paid all outstanding claims of the trust beneficiaries pursuant to its obligation under the payment bond. Under equitable subrogation principles, where a surety has fully satisfied its obligations under a payment *265 bond and the owner has retained funds to be used in completion of the improvement,
"the [owner] had a right to use the retained fund to pay laborers and materialmen; * * * the laborers and materialmen had a right to be paid out of the fund; * * * the contractor, had [it] completed [its] job and paid [its] laborers and materialmen, would have become entitled to the fund; and * * * the surety, having paid the laborers and materialmen, is entitled to the benefit of all these rights to the extent necessary to reimburse it" (Pearlman v Reliance Ins. Co., 371 US 132, 141 [1962]).
Thus, in Caristo Constr. Corp. v Diners Fin. Corp. (21 NY2d, at 510, 515, supra), we determined that a contractor/co-obligor who satisfied the claims of unpaid subcontractors and suppliers under a payment bond succeeded to the Lien Law article 3-A rights of those trust beneficiaries and, thus, could maintain an action to recover diverted trust funds. The general contractor, as subrogee, was treated as the sole claimant under article 3-A and was not required to sue as representative of the beneficiaries (see, id., at 515). Since the claims of the article 3-A trust beneficiaries have priority over DOL's cross-withholding, RLI, as subrogee, has a superior right to the funds currently held by the owner.
Further, this Court has long held that a completing surety succeeds under equitable subrogation principles to all rights that the obligee/owner has against the contractor, including the right to use the unpaid contract balance to complete the project or satisfy outstanding claims for labor and materials furnished (see, Aetna Cas. & Sur. Co. v United States, 4 NY2d 639, 644-645 [1958]; United States Fid. & Guar. Co. v Triborough Bridge Auth., 297 NY 31, 35-36 [1947]; Scarsdale Natl. Bank & Trust Co. v United States Fid. & Guar. Co., 264 NY 159, 164 [1934]; see also, Pearlman v Reliance Ins. Co., supra, at 137). Here, the contract between White and the Queensbury Union Free School District permitted the School District, as owner, to use the contract balance to pay for completion of the project. Upon completion of its obligations under the bonds, RLI became subrogated to this right as well. Moreover, if the parties had alleged or demonstrated that the funds at issue were assets of an owner's trust (see, Lien Law § 70 [5]), RLI could assert the owner's right and obligation under section 71 (1) to ensure that the funds were used for the purposes of the trust.
*266 Our decision in City of New York v Cross Bay Contr. Corp. (93 NY2d 14, supra) does not compel a different result. In Cross Bay, we held that where "it appears that the surety has not even completed payment of all valid payment claims, the surety should not be accorded an automatic priority over the claims of Article 3-A trust beneficiaries" (93 NY2d, at 22, supra). Cross Bay is thus distinguishable in two significant respects. First, RLI has fully performed its obligations under both the payment and performance bonds. Second, here the surety is not competing for priority with a conceded article 3-A trust beneficiary, such as the United States Government claiming payment of withholding taxes on the public improvement project covered by the bonds.
Contrary to DOL's position, our decision does not render its rights under Labor Law § 220-b (2) (a) (1) meaningless. Our decision does not affect its statutory right to file Notices of Withholding and Cross-Withholding. It deals only with the priority of entitlement to funds held by the owner as against that of a fully paying and performing surety, as subrogee of both the owner and article 3-A trust beneficiaries, when the balance due under the contract is less than the amount the surety expended in fully completing its obligations under the bonds. Here, it is uncontested that the amount of funds held by the School District and remaining due under the contract at the time of White's default was less than what RLI expended. Thus, under these circumstances, RLI is entitled to vacatur of the cross-withholding.
Finally, a holding in favor of RLI here is supported by public policy considerations. Were we to adopt DOL's position, completing sureties would be forced to pay for obligations they did not bond. Such a result would lead to increased risks and uncertainties of exposure for sureties and, ultimately, greater costs to the taxpayers on public improvement projects.
Accordingly, the order of the Appellate Division should be reversed, with costs, the petition granted and DOL directed to withdraw its Notice of Cross-Withholding.
Order reversed, etc.
NOTES
[*] Under Lien Law article 3-A, wage-related claims of laborers, as trust beneficiaries, are given priority status (see, Lien Law § 77 [8]). In this proceeding, RLI has not contested the priority of DOL's Notice of Withholding for unpaid laborers' prevailing wages attributable to the Queensbury Project.